RECEIVED
OCT 15 2004
AT 8:30 ________ M
WILLIAM T. WALSH
CLERK

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

Stephanie Thomas, on behalf of herself and all others similarly situated,

Plaintiff,

vs.

DAVID C. McCOURT, MICHAEL J. MAHONEY, COMPENSATION COMMITTEE, EUGENE ROTH, ALFRED FASOLA, MICHAEL B. YANNEY,, JOHN D. FILIPOWICZ, TERRELL WINFIELD JR., DEBORAH M. ROYSTER, MERRILL LYNCH TRUST COMPANY, FSB AND UNKNOWN DEFENDANTS 1 - 100,

Defendants.

Civil Action No. 04-5068(SRC)

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

**PREFATORY NOTES**

- On May 27, 2004, RCN Corporation ("RCN" or the "Company") and certain of its subsidiaries filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. The bankruptcy case is ongoing. As such, this action is stayed as to RCN unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiff Stephanie Thomas is not prosecuting this action vis-a-vis RCN.

- If the bankruptcy stay is modified or lifted to permit further prosecution of this action against RCN, Plaintiff will notify the Court and will proceed against RCN.

- To the extent that proceeding against "committees" of RCN, as enumerated herein, will be deemed violative of the bankruptcy proceeding, Plaintiff will only proceed against the committees' members as set forth herein.

- All allegations contained herein are based on the investigation of counsel, except for allegations pertaining to the named Plaintiff, which are partially based on personal knowledge. As a result, it is likely that, once the discovery process begins in earnest, the roles of additional parties in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further defined. In that event, Plaintiff will seek leave to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties.

Plaintiff Stephanie Thomas ("Plaintiff"), a participant in the RCN Savings and Stock Ownership Plan (the "Plan"), on behalf of herself and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

1. This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries, including RCN.

2. Plaintiff was an employee of RCN and is a participant in the Plan. Plaintiff's retirement investment portfolio under the Plan included RCN stock during the Class Period.

3. Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of RCN stock .

4. During the Class Period, Defendants knew or should have known that RCN stock was an imprudent investment alternative for the Plan, whether for individual or Company matching contributions. RCN stock was an imprudent investment due to the Company's unsustainable expansion strategy that resulted in a ballooning mountain of debt, forcing RCN to ultimately file for bankruptcy. Yet, throughout this period, despite RCN's precarious financial condition, the Defendants took little or no action to protect the Plan and its participants.

5. Defendants are liable under ERISA to restore losses sustained by the Plan and its participants as a result of their breaches of their fiduciary obligations.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

**THE PLAN**

8. The RCN Savings and Stock Ownership Plan ("Plan") is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries.

9. According to RCN's Form 11-K filed with the Securities and Exchange Commission (SEC) on June 29, 1999 for the fiscal year ended December 31, 1998 ("1998 11-K"), the Plan was

formed for the benefit of employees of the Company as a consequence of the distribution of common stock of RCN Corporation by C-TEC Corporation ("C-TEC"), the Company's former parent. In connection with the formation of the Plan and the restructuring, assets amounting to $9,282 were transferred to the Plan.

10. According to RCN's Form 11-K filed with the SEC on June 28, 2004 for the fiscal year ended December 31, 2003 ("2003 11-K"), the Plan is a defined contribution plan covering substantially all employees of RCN and its subsidiaries who have attained the age of eighteen and have one month of enlisted service.

11. The Company's 2003 10-K states that participants in the Plan may contribute between 1 percent and 50 percent of their annual compensation into the Plan.[1]

12. Participants, as stated in 2003 11-K, direct the investment of their contributions into various investment options offered by the Plan. According to the 2003 11-K, the Plan offers twenty-four mutual funds, one common collective trust, three "Global Manager" predetermined portfolios and a RCN Common Stock Fund as investment options for participants.

13. Moreover, the 2003 10-K provides that the Company contributes on behalf of each participant an amount not to exceed 100% of the first 3.5% of the participant's contribution. Company contributions were used to purchase RCN common stock exclusively. On January 16, 2004, the Plan was altered so that the Company matching contributions would no longer be invested exclusively in RCN Common Stock .

[1] According to the 1999 11-K, prior to the Plan amendment, effective January 1, 2002, participants could have contributed between 1% and 15% of their annual compensation.

14. According to the Company's 2003 11-K, Participants are immediately vested in their contributions plus actual earnings thereon. Vesting in the Company's matching contribution portion of their accounts is based on years of continuous service, as indicated in the following table:

| Years of Service | Percentage Vested |
|---|---|
| Less than 2 | 0 % |
| 2 but less than 3 | 25 % |
| 3 but less than 4 | 50 % |
| 4 but less than 5 | 75 % |
| 5 or more | 100% |

15. According to the Company's 2003 11-K, Merrill Lynch Trust Company, FSB was the Plan's Trustee.

## PARTIES

### Plaintiff

16. Plaintiff Stephanie Thomas was a RCN employee, a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held RCN common stock in her retirement investment portfolio during the Class Period.

### Defendants

17. Defendant David C. McCourt ("McCourt") was, at all relevant times, the Company's Chairman and Chief Executive Officer ("CEO"). Upon information and belief, McCourt was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

18. Defendant Michael J. Mahoney ("Mahoney") was the Company's President and Chief Operating Officer during the Class Period, and signed the Company's 1998 11-K in that capacity.

Upon information and belief, Roth was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

19. Defendant Compensation Committee, according to the Company's Schedule 14A proxy statements filed with the SEC during the Class Period, administers the Company's 1997 Equity Incentive Plan, Executive Stock Purchase Plan and the Plan. Consequently, the Compensation Committee and its individual members were a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

20. Defendant Eugene Roth ("Roth") served as the Chairman for the Compensation Committee during the Class Period. Roth was therefore a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

21. Defendant Alfred Fasola ("Fasola") served on the Compensation Committee during the Class Period. Fasola was a therefore fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

22. Defendant Michael B. Yanney ("Yanney") served on the Compensation Committee during the Class Period. Yanney was therefore a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

23. Defendant John D. Filipowicz ("Filipowicz") was the Company's Chief Administrative Officer and signed the Company's 2001 11-K in that capacity. In addition, Filipowicz also signed the Plan's fiscal 2000 Form 5500 annual report to the Internal Revenue Service ("IRS") and Department of Labor ("DOL") as the "Plan Administrator." Upon information and belief, Filipowicz was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

24. Defendant Terrell Winfield Jr. ("Winfield") was the Company's General Counsel and Corporate Secretary during a portion of the Class Period. Defendant Winfield signed the Company's 2002 11-K as the Plan's Administrator. In addition, Winfield also signed the Company's fiscal 2002 Form 5500 IRS/DOL annual report in that capacity. Upon information and belief, Winfield was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

25. Defendant Deborah M. Royster ("Royster") was the Company's General Counsel and Corporate Secretary during a portion of the Class Period. Defendant Royster signed the Company's 2003 11-K as the Plan Administrator. Upon information and belief, Royster was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

26. Defendant Merrill Lynch Trust Company, FSB ("Merrill Lynch Trust") is headquartered at 1300 Merrill Lynch Drive, 3rd Floor, Pennington, New Jersey 08534. Merrill

Lynch Trust is a subsidiary of Merrill Lynch & Co., Inc. ("Merrill Lynch"). As previously stated, Merrill Lynch Trust is the trustee for the Plan. At a minimum, as the Plan's Trustee, Merrill Lynch Trust owed the Plan's participants and their beneficiaries the duty to monitor the prudence of investment in the Company stock and notify the Committee and the participants when investment in the Company stock was clearly no longer prudent. During at least part of the Class Period, as more fully explained below, Merrill issued reports regarding the prudence of investing in RCN stock. Despite the perils spiraling the Company into bankruptcy, Merrill Lynch Trust failed to take any action with regardless to the Plan or its participants. Merrill Lynch Trust was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

27. Unkown Fiduciary Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plan during the Class Period. These Defendants, whose identities are currently unknown to Plaintiff, may include additional RCN employees. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

28. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the RCN Plan at any time between January 12, 1999 and the present (the "Class Period") and whose accounts included investments in RCN common stock.

29. The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

30. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

(b) whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c) whether Defendants violated ERISA; and

(d) whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

31. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan, and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

32. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with

respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

34. Class action status is also warranted under the other subsections of Rule 23(b) because: (I) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class and Plan as a whole, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FIDUCIARY STATUS

35. During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

36. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief the Compensation Committee is a named fiduciary of the Plan. As noted above, the Compensated Committee is charged with the administration of the Plan and its assets.

37. Instead of delegating all fiduciary responsibility for the Plan to external service providers, RCN chose to internalize at least some of this fiduciary function.

38. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

## DEFENDANTS' CONDUCT

### A. RCN's Common Stock Was An Imprudent Investment For The Plan

**Background**

39. In late 1997, C-TEC spun off its subsidiary, RCN, into an independent company. At the time of the split, RCN provided competitive cable television and telecommunications services in Boston and New York. Within a year and a half of gaining independence, however, RCN's plan for growth had changed.

40. The cable provider's new focus was on unseating telecom giants and local cable companies by offering consumers bundled packages of new economy services, including voice, video, and high-speed Internet access. In order to execute its ambitious expansion strategy, RCN was forced to take on large amounts of debt. Unfortunately for RCN, building fiber-optic networks in densely populated residential areas proved to be a time consuming and an overwhelmingly expensive proposition.

41. During this period of aggressive growth, RCN led Plan participants to believe that the Company was experiencing incredible progress, growth and strategic achievements. However, by the winter of 2000, it became clear that the Company's spending was rapidly outpacing revenue despite the fact that the Company continued to reach customers in many new markets. In fact, as RCN increasingly lost control of its costs, demand for its products evaporated due to competitive pressures. This economic reality led RCN to file for bankruptcy on May 27, 2004.

**History of RCN**

42. In February 1997, C-TEC, a New Jersey based, telecommunications conglomerate, announced its plan to separate its operations along business lines into three separate, publicly traded companies, including RCN. Prior to the split, RCN was a subsidiary of C-TEC, which provided competitive video and telecommunications services in Boston and New York. In discussing the split, C-TEC stated:

> "RCN Telecom, our CLEC operation, has made tremendous in-roads since we launched services this summer. This restructuring allows the people who are working on RCN to devote all of their energies to developing this exciting venture," said McCourt.
>
> RCN Telecom Services is the country's largest competitive residential provider of packaged local and long distance telephone, video and Internet access services over fiber optic networks. RCN Telecom Service's operations, launched in August 1996, has over 40,000 subscribers in Boston and New York and revenues of over $4 million at the year ended 1996.

43. On October 1, 1997, RCN began trading its shares on Nasdaq. Concurrently, the newly formed corporation created the Plan.

44. After becoming an independent entity, RCN continued to strengthen its existing

business and to slowly develop its fiber-optic cable network. RCN began deploying its advanced fiber optic networks in Boston, New York and in the Lehigh Valley just north of Philadelphia. In Boston, RCN operated through a joint venture with Boston Edison. RCN also announced plans to offer services to Washington D.C. area residents through a proposed joint venture with a unit of Potomac Electric Power Company.

45. During this period, RCN raised $575 million in proceeds from a high-yield debt placement, bringing its total capital on hand for network expansion and development of RCN's advanced fiber optic networks to over $700 million.

46. Throughout the year 1998, RCN continued its expansion of the Company's fiber-optic facilities throughout its already established telecommunications "footprint" through slow steady growth. Indeed, the Company's growth strategy focused on building all of its current markets to economic viability. Consequently, the Company enjoyed unprecedented success, while maintaining relatively low losses.

47. These positive developments emboldened RCN's management, however, as it began leveraging the Company's success to raise funding. By the end of the third quarter of 1998, RCN had over $1.2 billion in cash, which it now intended to utilize in an aggressive pursuit for expansion in the Northeast and in the West of the country.

**RCN's Strategy Shift Toward Unprecedented Expansion**

48. By year-end 1998 the Company had received open video systems ("OVS") approvals from the Federal Communications Commission ("FCC") to pass more than six million homes with its fiber-optic network. RCN aspired to provide its bundled tele-video-Internet communication

services to some of the most attractive/promising residential areas in the country, including markets from Boston to Washington, DC and San Francisco to San Diego in California. The Company valued these high-density regions because it could reach more clients there with one fiber optic cable, than it could in sparsely populated rural and suburban areas. To reach this objective, RCN's business scheme focused on building a sprawling, nationwide fiber-optic network to deliver cable-TV, telephone, and Internet services to homes via one "pipe" or cable.

49. In early 1999, RCN began to aggressively pursue this bold new expansion strategy. On January 12, 1999, RCN announced an agreement with Level 3 Communications, Inc. ("Level 3") that would provide RCN, with a robust cross-country fiber backbone allowing connectivity to major Internet connection points in the U.S. With this agreement, RCN now had a robust, fully-redundant, nationwide clear-channel DS-3 Network capable of delivering its bundle of products, with a presence at two major Internet Network Access Points ("NAPs") and with three additional NAP connections pending. Commenting on these news, defendant McCourt stated:

> This cross-country link is an essential element of our plan to provide the highest levels of service to RCN's Internet subscribers on both the East and West Coasts[.]...It supports RCN's plan to become a truly bi-coastal communications company offering service over one connected and cohesive network. **This strategy will lower our costs and offer the economies of scale so essential to preserving RCN's status as the low-cost operator in all of the markets we serve.** (Emphasis added).

50. Soon after completing the deal with Level 3, RCN actively began expanding its fiber-optic network by signing local approval agreements to provide phone, cable and Internet services in different parts of the country. In the spring of 1999, RCN signed local approvals with the Boston area towns of Burlington and Lexington, the city of South San Francisco and the city of San

Francisco, California.

51. On March 18, 1999, RCN announced that it had raised $1.25 billion in new financing through the sale of $250 million in senior convertible preferred stock to Hicks, Muse, Tate & Furst and a $1 billion bank facility that has been arranged by Chase Securities Inc. In its press release, defendant McCourt stated:

> On the heels of our first local approval to serve California residents, and some very meaningful milestones for our East Coast operations, comes this very significant influx of long-term capital, which fully funds the RCN business plan through our initial phases[.]...**With more than $2.25 billion in cash and available capital, RCN has continued to demonstrate broad and ready access to the capital markets.** (Emphasis added).

52. Defendant McCourt went on to assert:

> **This strategic investment reflects a real confidence in the RCN business plan, and in our progress to date**[.]...Hicks Muse is a smart, sophisticated and long-term investor that is in radio, outdoor advertising and television businesses in the same markets RCN is aggressively attacking. We are proud to have them associated with RCN's continued success. (Emphasis added).

53. On May 4, 1999, RCN release its first quarter 1999 results. RCN announced that its first quarter results show that it was continuing to successfully execute its plan to become the preeminent facilities-based provider of phone, cable, and Internet services to the residential market from Boston to Washington and San Francisco to San Diego. However, the with respect to its losses, the Company stated:

> **RCN's Pro Forma Total consolidated quarterly EBITDA[2] was a loss of $21.5 million, as compared to a loss of $15.7 million in the**

[2] Earnings before interest, taxes, depreciation and amortization ("EBITDA").

> **previous quarter.** The losses reflect the company's continued development of its operations in the Boston to Washington, D.C. and San Francisco to San Diego corridors.
> (Emphasis added).

54. Despite the increase in expenses RCN continued its ambitious pursuit of new markets. In the summer of 1999, RCN obtained local approval to deploy its state-of-the-art fiber optic network in Redwood City, and Daly City in California, a Boston area town of Belmont, and announced plans to begin service in the Philadelphia market.

55. On July 30, 1999, RCN reported results for the second quarter ended June 30, 1999, including quarter-over-quarter increases of 20% in marketable homes, 22% in advanced fiber homes passed and nearly 30% in route fiber miles constructed -- all key indicators of the aggressive expansion of RCN's network. With respect to its losses, the Company stated:

> **RCN's Pro Forma Total consolidated quarterly EBITDA was a loss of $24.7 million, compared to a loss of $21.5 million in the previous quarter.** The losses reflect the company's continued development of its operations in the Boston to Washington, D.C. and San Francisco to San Diego corridors. (Emphasis added).

56. In the Fall of 1999, RCN signed agreements to provide service in Falls Church, Virginia, City of Hoboken, New Jersey, the towns of Dedham and Needham, and the city of Woburn, near Boston.

57. On October 4, 1999, RCN announced that Vulcan Ventures, Inc., the investment organization of Paul G. Allen, was making a $1.65 billion investment in RCN. Commenting on the news, the Defendant McCourt stated:

> **This very significant investment in RCN allows for continued expansion of the RCN business plan with a partner that shares our vision**[.]....The fact that Vulcan Ventures is coming on board in

> such a meaningful way also serves as a major vote of confidence in RCN's business plan, our excellent people and our progress to date. Vulcan is going to be a tremendous partner who will bring their vision of a Wired World, which we share, to a company that is working every day to make it happen.
>
> ***
>
> To continue to create value for our customers and shareholders, we must focus on network deployment and perfecting the operating support systems that will fuel the next phase of our development. (Emphasis added.)

58. On October 28, 1999, RCN reported results for the third quarter ended Sept. 30, 1999, which include strong double-digit growth in advanced fiber homes passed, marketable homes and on-net connections. RCN's quarterly EBITDA was a loss of $32.6 million, compared to a loss of $24.7 million in the previous quarter. The losses reflected the Company's continued development of its operations in the Boston to Washington, D.C. and San Francisco to San Diego corridors.

59. Despite the mounting losses, RCN continued to promote its growth. In the winter of 1999/2000 RCN signed agreements to provide service in San Mateo, California, Norwood Borough, Pennsylvania, and Jersey City, New Jersey. Additionally, RCN announced that it had signed a definitive agreement to acquire Chicago's only single-source, facilities-based provider of bundled telecommunications services, 21st Century Telecom Group, Inc., in a transaction valued at approximately $500 million, payable in RCN stock and assumed debt.

60. Indeed, throughout 1999, RCN's growth into new markets was proceeding at a breakneck pace. At this time, RCN, with uncontrolled zeal, continued to pour money into the creation of the required infrastructure. As of December 31, 1999, the Company had raised $2.1 billion in capital.

61. Despite the Defendants' public enthusiasm regarding the Company's spectacular penetration into new markets, RCN was slowly sinking under the weight of it obligations. RCN's untenable, "pie-in-the-sky" expansion strategy undermined the prudence of investing in RCN stock. RCN's ballooning debt load eventually became crushing, and ultimately led the Company into bankruptcy. During this time, the Plan and its participants were forced to remain invested in RCN common stock through the Company's matching contributions, and were enticed to keep participant contributions so invested by the Company's rose-colored pronouncements.

**RCN's Spiral Into Bankruptcy**

62. On February 10, 2000, RCN reported results for the year and quarter ended December 31, 1999. Commenting on the results, defendant McCourt stated:

> This year was the most significant in the company's history. We secured $1.65 billion from one of the world's most respected strategic investors, Paul Allen of Vulcan Ventures; we accelerated the pace of our construction through several key alliances; and we increased the scale and scope of our business model through the launch of our West Coast operations and through an agreement to acquire 21st Century in Chicago[.]...**Not only are we fully funded through nearly 5 million homes, we are more confident than ever that the asset we are building -- a brand new high capacity network --- will become progressively more valuable over time as demand for local capacity continues to increase.** (Emphasis added).

63. Yet, despite the glowing assessment form the Company's CEO, RCN was facing a significant increase in losses:

> Significant investments in the Company's network, training and development, and brand marketing, as RCN nearly quadrupled its markets under construction to 49 from 13, resulted in EBITDA losses, **before certain one-time charges, of $133.1 million for the year, including $54.3 million in the fourth quarter, as compared to a**

**loss of $48.5 million in 1998.** (Emphasis added).

64. On this news, shares of RCN fell $5.4375 per share or 7.71 percent, on February 10, 2000, to close at $65.0625 per share.

65. Throughout the year, RCN's repeated the same pattern, as shares fell on the news of mounting losses. In fact, the Company's stock tumbled from a high of $72 to a low $6.06, or a 90% decline in less than a year, as the market reacted to RCN mounting losses and burgeoning debt load.

66. On December 21, 2000, after RCN stock shed 90% of its value from its Class Period high, the Company outlined its 2001 plans for its local broadband business. In the press release, defendant McCourt admitted that the Company's **"growth trajectory" was unsustainable.** (Emphasis added).

67. RCN announced that it was scaling back its expansion plans in favor of selling more of its services to existing customers and lowering capital expenditures 42% to $749 million in 2001. But even with these cuts, RCN was expected to have operating losses of $350 million. Consequently, these measures did little to revive the now deflated Company.

68. Despite the dire outlook, however, Defendants did nothing to protect plan participants from the mounting losses to their retirement savings accounts. In fact, for the next two and a half years as RCN struggled to stay afloat, but remained burdened by a billion dollar deficit accumulated during the years of unsustainable expansion, Defendants continued to ignore the plight of the Plan participants locked into the ownership of RCN stock.

69. It was not until January 16, 2004, only four months before the Company filed for bankruptcy, that Defendants took any steps to ameliorate their situation, by mandating that Company

match contributions would no longer be applied to the RCN Common Stock. Simply put, Defendants' actions were too little too late in terms of protecting the Plan and the Plan participants from the massive losses they suffered as a result of the Plan's imprudent investment in RCN stock.

70. On May 27, 2004, RCN, recognizing the magnitude of their debt load, filed for reorganization under Chapter 11 of Title 11 of the Bankruptcy Code in the Southern District Court of New York.

**B. Defendants Knew or Should Have Known that RCN Stock Was Not a Prudent Plan Investment**

71. At all relevant times, Defendants knew or should have known that RCN was engaged in highly questionable business practices -- an unsustainable and prohibitively expensive quest to build a nationwide fiberoptic tele-video-Internet delivery network as detailed above – which made RCN Stock an imprudent Plan investment during the Class Period.

72. As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true operational and financial health of the Company, any generalized warnings of market and diversification risks that RCN made to Plan participants did not effectively inform Plan participants of the past, present, and future dangers of investing in Company Stock.

73. The Defendants failed to conduct an appropriate investigation into whether RCN Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding RCN's improper activities so that participants could make informed decisions regarding RCN Stock in the Plan.

74. An adequate investigation by the Defendants would have revealed to a reasonable fiduciary that investment by the Plan in RCN Stock, under these circumstances, was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

75. Because Defendants knew or should have known that RCN was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in RCN Stock.

76. Defendants had available to them several different options for satisfying this duty, including: making appropriate, accurate, unbiased public disclosures as necessary; divesting the Plan of RCN Stock; discontinuing further Plan contributions and/or investment in RCN Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as Plan fiduciaries to the extent that as a result of their employment by RCN they could not loyally serve Plan participants in connection with the Plan's acquisition and holding of RCN Stock.

77. Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in RCN Stock. In fact, upon information and belief, the Defendants continued to invest and allow investment of Plan assets in Company Stock even as RCN's improper practices and gross corporate mismanagement came to light.

78. Merrill Lynch Trust's failure to determine that the Company's stock was an imprudent

investment is particularly apparent. As Trustee for the Plans, and hence responsible for maintaining each of the Plans participants accounts, Merrill Lynch Trust knew or should have known as the Company began its precipitous decline – eventually descending into bankruptcy – that the Company's stock was no longer a prudent investment for retirement savings.

79. Merrill Lynch was required to act in the best interests of the Plans' participants and their beneficiaries in accordance with its duty under ERISA § 403(a)(1). Merrill Lynch Trust's continued allowance of permitting the Plans' participants to invest in RCN stock, when it was clearly an imprudent investment, demonstrates Merrill Lynch Trust's failure to fulfill its fiduciary duty to the Plan and its participants.

80. For example, analysts at Merrill repeatedly issued reports that seemed to recognize the poor quality of RCN stock as a retirement investment. On December 1, 2001, Merrill Lynch cut its rating of RCN stock to "neutral" and then discontinued rating the stock. Irrespective of this precipitous downgrade[3] and discontinuance of coverage by its *own* investment analysts, Merrill Lynch Trust continued to purchase RCN stock for the Plan and allow Plan participants to direct their contributions into RCN stock..

**CLAIMS FOR RELIEF UNDER ERISA**

81. At all relevant times, Defendants were and acted as fiduciaries within the meaning

[3] Merrill, until June 15, 2001, utilized a five-category stock rating system comprised of "buy", "accumulate", "neutral," "reduce", and "sell". According to New York State Attorney General Elliot Spitzer and others, Merrill rarely, if ever, used the "reduce" or "sell" ratings, thereby converting the a five-category system into a three-category system. As a consequence, the "neutral" rating became the worst rating a stock could receive during the time. Moreover, if the Merrill Lynch wanted to voice a "reduce" or "sell" recommendation without explicitly stating so, it would allegedly discontinue to rate the stock.

of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

82. ERISA § 502, 29 U.S.C. §1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

83. ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

84. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

85. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things,

a. The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment

alternatives of a plan, including in this instance RCN stock, to ensure that each investment is a suitable option for the plan;

b. A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c. A duty to disclose and inform, which encompasses:

(1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

86. ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

87. Plaintiff therefore brings this action under the authority of ERISA § 502 for Plan-wide

relief pursuant to ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants.

## CAUSATION

88. The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently allowed to be put at great risk by Defendants through Plan asset investment in RCN stock during the Class Period; in breach of Defendants' fiduciary duties. This loss is reflected in the diminished account balances of the Plan's participants.

89. Defendants are responsible for losses caused by participant direction of investment in RCN stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from participants, and provided misleading, inaccurate, and incomplete information to them regarding the true operational health and ongoing profitability of the Company, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in RCN stock, and Defendants remain liable under ERISA for losses caused by such investment.

90. Defendants are also responsible for all losses caused by the investment of the Plan's Company matching contributions in RCN stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

91. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in

RCN stock, eliminating RCN stock as an investment alternative when it became imprudent, and divesting the Plan from RCN stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in RCN stock.

**SECTION 404(c) DEFENSE INAPPLICABLE**

92. The Plan suffered a loss, and Plaintiff and the other Class members suffered losses, because substantial assets in the Plan were invested in RCN Stock during the Class Period in violation of the Defendants' fiduciary duties.

93. As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

94. Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, the Defendants did exactly the opposite. As a consequence, participants in the Plan did not have informed control over the Plan's assets that were invested in RCN Stock, and the Defendants remained entirely responsible for ensuring that such investments were and remained prudent.

95. Moreover, Section § 404(c) does not apply to any portion of the Plan deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide Plan participants with a full range of investment options, which an ESOP by its very nature does not.

*See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).

96. The Defendants' liability to Plaintiff for relief stemming from imprudent Plan investments in RCN Stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## COUNT I

### Failure to Prudently and Loyally Manage Plan Assets (Breaches of Fiduciary Duties in Violation of ERISA § 404 against all Defendants)

97. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

98. At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

99. As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company stock, as well as the vehicle for Company matching contributions.

100. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in RCN stock in the Plan were prudent, and are liable

for losses incurred as a result of such investments being imprudent.

101. Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan (e.g. plan trustees) to do so.

102. The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period the Defendants knew or should have known that RCN stock was not a suitable and appropriate investment for the Plan as described herein. Nonetheless, during the Class Period, these fiduciaries continued to offer the RCN Stock as an investment option for the Plan and to direct and approve the investment of RCN stock, instead of cash or other investments. Similarly, during the Class Period, these fiduciaries continued to provide Company matching contributions in RCN stock, instead of in a prudent retirement investment. In so doing, Defendants further breached their fiduciary duties. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in RCN stock and the Company matching contribution in the form of RCN stock. In addition, given that such a high percentage of the Plan's assets were concentrated in the stock of a single company, RCN, Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All of them failed to implement any such strategy.

103. The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

104. The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage Plan assets in exercising their discretion with respect to offering Company stock as an investment option in the Plan and providing the Company matching contributions in RCN stock, despite knowing that such failure was a breach; enabling the Defendants to fail to prudently manage Plan assets in exercising discretion with respect to Plan investments, including the match, as a result of their own fiduciary breaches; and by having knowledge of others' failure to prudently manage the Plan assets, yet not making any effort to remedy their breach.

105. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, suffered a significant depreciation in the value of its assets which are meant to help participants save for retirement.

106. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Monitor the Individual Defendants and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Defendant McCourt & the Compensation Committee)**

107. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

108. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

109. At all relevant times, as alleged above, the scope of the fiduciary responsibility of Defendants McCourt and the Compensation Committee included the responsibility to monitor other fiduciaries.

110. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (the individual Officer Defendants & the Trustee). In this case, that meant that the monitoring fiduciaries, RCN, had the duty to:

(1) Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

(2) Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3) Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan investments;

(4) Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5) Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

(6) Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries. These monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

111. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

112. Defendants McCourt and the Compensation Committee breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund. Defendants McCourt and the Compensation Committee knew or should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan

to continue offering the RCN stock as a Plan investment, and continuing to invest in RCN stock when it no longer was prudent to do so, yet failed to take action to protect the participants from the consequences of these fiduciaries' failures.

113. In addition, as a result of their inappropriate, unduly risky, and inaccurately portrayed business practices and implicit knowledge thereof, Defendants McCourt and the Compensation Committee, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of RCN that they knew or should have known that the monitored fiduciaries needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, Defendants McCourt and the Compensation Committee breached their monitoring duties under the Plan and ERISA.

114. Defendants McCourt and the Compensation Committee are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitoring fiduciaries; by enabling the breaches of the monitoring fiduciaries; and by having knowledge of these breaches yet not making any effort to remedy them.

115. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, suffered a significant depreciation in the value of its assets which are meant to help participants save for retirement.

116. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Provide Complete and Accurate Information to Plan Participants and Beneficiaries

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA against All Defendants)

117. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

118. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).

119. At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications.

120. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing misleading, incomplete, or inaccurate information or concealing material information regarding Plan investment options such that participants can make informed decisions with regard to investment options available under the Plan. This duty applies to all Plan investment options, including investment in RCN stock.

121. Because investment in the Plan was not diversified (i.e. the Defendants chose to invest the Plan overwhelmingly in RCN Stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate

information particularly important with respect to RCN stock.

122. The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding RCN stock, RCN's business improprieties, failed corporate ventures, and inherent financial weakness and over-extension, and the consequent artificial inflation of the value of RCN stock and, generally, by conveying inaccurate information regarding the soundness of RCN stock and the prudence of investing retirement contributions in the stock. These failures were particularly devastating to the Plan and the participants; a majority of the Plan's assets were invested in RCN stock during the Class Period and, thus, losses in this investment had an enormous impact on the value of the Plan (and therefore participants' retirement) assets.

123. Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding RCN stock, despite knowing of their breaches; by enabling such conduct as a result of their own failure to satisfy their fiduciary duties; and by having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet not making any effort to remedy the breaches.

124. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to an investment decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in RCN stock and were

material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in RCN stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants in this Count.

125. Plaintiff further contends that the Plan suffered a loss, and plaintiff and the other Class members suffered losses, by the above-described conduct of the Defendants in this Count during the Class Period because that conduct fundamentally deceived plaintiff and the other Class members about the prudence of making and maintaining investments in RCN stock, and that, in making and maintaining investments in RCN stock, plaintiff and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of the Defendants in this Count.

126. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and the Plan's other participants and beneficiaries, suffered a significant depreciation in the value of its assets which are meant to help participants save for retirement.

127. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**REMEDY FOR BREACHES OF FIDUCIARY DUTY**

128. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to

make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

129. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the plan had been properly administered.

130. The Plan, Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A. A Declaration that the Defendants, and each of them, have breached their ERISA

fiduciary duties to the Plan and its participants;

B. A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E. An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in RCN stock, maintained by the Plan, in proportion to the accounts' losses attributable to the precipitous decline in the price of RCN stock;

H. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I. An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: October 15, 2004

Respectfully submitted,

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By: ______________________
Lisa J. Rodriguez (LR6767)
8 Kings Highway West
Haddonfield, NJ 08033
Tel: (856) 795-9002

**SCHIFFRIN & BARROWAY, LLP**
Richard S. Schiffrin
Joseph H. Meltzer
Edward W. Ciolko
Gerald Wells III
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
Tel: (610) 667-7706